UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-21577 CIV-GOLD/Magistrate Judge Turnoff

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, INC., GREATER MIAMI CHAPTER; MIAMI-DADE COUNTY STUDENT GOVERNMENT ASSOCIATION, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| MIAM-DADE COUNTY SCHOOL BOARD; RUDOLPH F. CREW, in his official capacity as Superintendent of Schools, Miami-Dade County Public Schools, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

NIGHT BOX FILED
JUL 06 2006
CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## MEMORANDUM OF
## AMICUS CURIAE, FLORIDA LIBRARY ASSOCIATION
## SUPPORTING THE POSITION OF PLAINTIFFS

The Florida Library Association ("FLA") files the following Memorandum of Law, subject to the Court's granting its Motion to Appear as Amicus Curiae and to File Amicus Curiae Memorandum filed concurrent herewith:

### Introduction

While this Memorandum of Law supports the position taken by the Plaintiffs, namely, that the removal of the subject books from school libraries by order of the Miami-Dade County School Board ("Board") is an unconstitutional deprivation of students' First Amendment rights, the FLA supports no remedy, nor does it seek to have a stake in the case as a party or intervenor



might have. Rather, the FLA seeks to inform the Court of positions long held by professional librarians that bear on the issue which is at stake in this case and to offer to the Court its view of controlling law.

In sum, professional librarians acknowledge and support the authority of public officials to establish standards and criteria for the selection of materials of all types to be placed in library collections maintained by public entities, that is, school boards, cities, counties, the state and its agencies, library districts, postsecondary schools. They support processes for evaluating complaints by patrons concerning materials so selected. They necessarily recognize the need for standards and criteria for "weeding," that is, removing and disposing of materials from collections that are outdated, no longer used, damaged, or otherwise no longer applicable materials. On the other hand, as an organization of professional librarians, the FLA maintains, as do professional librarians individually, the necessity of guarding against removing materials from collections based upon a desire to take from the reading public, no matter whether adults in a public library or children in an elementary school, materials which have become controversial because of their content. It is the essence of libraries that they provide resources to their patrons which may be used by them as patrons think best. Professional librarians view as a fundamental right of their patrons, and indeed a right guaranteed by the First Amendment of the United States Constitution, that they may expect collections to contain works expressing diverse points of view, or indeed expressing no point of view.

Again, the FLA stresses its acknowledgment and support of the right of public officials to regulate through standards and criteria what materials are appropriate to the library collection they ultimately oversee and to provide appeals for those who believe that materials have been placed in the collection in error or disregard for such standards and criteria; however, should

these officials react to changing political or social ideas in order to censor collections by removing materials for reasons offensive to their patrons' First Amendment rights, professional librarians support the need for the Court's to intervene in order to protect these rights.

### Question Addressed by Amicus Curiae

The FLA has asked to address the Court in this Memorandum in order to speak to this issue: whether the Board's order requiring the removal of books of the "A Visit To" series ("Visit Books"), and specifically the book ¡Vamos a Cuba! (English form "*A Visit to Cuba,*"), from the libraries of Miami-Dade County schools is an unconstitutional deprivation of student rights.

### Facts Relied Upon by Amicus Curiae

The FLA is mindful that the Court will take evidence at the hearing on Plaintiffs' motion for relief. It is further mindful that the question it addresses in this Memorandum cannot be decided in a factual vacuum. The FLA asserts, however, that facts available from the public record of the Board's actions are sufficient decide in this case. Consequently, the FLA relies on these facts:

1. Miami-Dade schools acquired certain books in the Visit Book series, which were placed in library collections of various schools.

2. The Visit Books were subjected to the county's established selection process embodied in School Board Rule 6Gx12-6A-1.26 ("Board Rule"). *See also* Fla. Stat, § 1006.34(2)(b)(certain selection standards which must be included in determining propriety of materials).

3. A complaint relating to ¡Vamos a Cuba!/ A Visit to Cuba led to a formal appeal process directed to whether that book should be removed from the library collections; two review committees were appointed according to the Board Rule.

4. Each of these committees found overwhelmingly that ¡Vamos a Cuba!/ A Visit to Cuba met Board Rule selection standards and should be retained in libraries.

5. Appeal was taken to the Board itself, which considered the recommendation of the School Superintendent that ¡Vamos a Cuba!/ A Visit to Cuba be retained in the collections.

6. The Board issued an order stating in pertinent part:

> The foregoing [rejection of the Superintendent's recommendation] is based upon the findings reflected by the record of these proceedings, and more specifically the finding that the book [¡Vamos a Cuba!/ A Visit to Cuba] is inaccurate and contains several omissions. It is further ordered that this book and the series it is part of, be replaced, throughout the school district, with a more accurate set of books that is more representative of actual life in these countries.

7. The record of the Board's meeting shows that the inaccuracies complained and omissions complained of by the Board relate chiefly to a perceived failure to portray life in Cuba as made harsh and by a totalitarian government.

Based on clear case law and the sound public policy which it reflects, the FLA will argue below that the Board's order violates student First Amendment rights.

**The Law with Respect to Removal of Books from Collections of Public School Libraries**

The seminal case for constitutional issues implicated in the removal of books from library collections by public officials is *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). It is well known that *Pico* was a plurality decision and so must be used with care as a precedent. Nonetheless, it provides clear guidance for the present case.

Since 1977, the Supreme Court has recognized that a controlling holding of the Court may be derived from a plurality decision. Quoting the plurality opinion of *Gregg v. Georgia*, 428 U.S. 153, 169, n. 15 (1976), the Court observed: "'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. U.S.*, 480 U.S. 188, 193 (1977). "In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer*, 950 F.2d 771, 781 (D.D.C. 1991)(en banc).

Reduced to its narrowest holding, five justices of the *Pico* court implicitly agreed that there are constitutional limits to the right of school officials to remove books from a school library collection. In deciding a case quite similar to that before the Court here, the Fifth Circuit stated the proposition in this way:

> Justice White's concurrence in *Pico* represents the narrowest grounds for the result in that case, and it does not reject the plurality's assessment of the constitutional limitations on school officials' discretion. The concurrence merely states that the procedural posture of the case did not require addressing the constitutional questions presented because a material issue of fact existed, precluding summary judgment.

*Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184, 188 (5th Cir. 1995)(footnote omitted); *see also Case v. Unified School Dist. No. 233*, 908 F. Supp. 864, 874-75 (D. Kan. 1995) (*Pico* followed, notwithstanding plurality decision, in absence of circuit court precedent, as sole statement on book removal). Thus, without delving into the specific reasoning upon which the plurality of three, joined in almost all the opinion by Justice Blackman, decided the case, it is clear that Justice White agreed with the plurality and concurrence on the baseline proposition

5

that facts could exist which would render unconstitutional the removal of books from a school library by school officials.

The tension is and continues to be the balance to be struck between the deference afforded local government in educational matters and the constitutional rights guaranteed to students. Three Supreme Court opinions illustrate the guidance the Court has given in sorting out these questions.[1] In *Tinker v. Des Moines Independent School District*, 393 U.S. 593 (1969), the Court established that school officials could not censor students' non-disruptive political expression. The Court noted:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech and expression at the schoolhouse gate.

*Id.* at 506.

In 1982, the Court in *Pico* took up the specific question of First Amendment rights with respect to school libraries. In *Pico*, the division between the plurality and the dissent disagreed over the characterization of the issue, the plurality "focusing on the library as the embodiment of the marketplace of ideas," and the dissent "view[ing] the library as part of the school's curricular environment." *Burch v. Barker*, 861 F.2d 1149, 1157 (9th Cir. 1988).

In 1988, the Court addressed curricular issues directly in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) where the question concerned whether school administrators violated First Amendment rights in removing material from the school-sponsored student newspaper. Justice White (the "narrowest" concurring Justice in *Pico*) writing for the majority, began the analysis by citing *Tinker*: "Students in the public schools do not 'shed their

---

[1] For a discussion, see Note, *Tinkering with* Tinker: *Academic Freedom in the Public Schools—* Hazelwood School District v. Kuhlmeier, *108 S. Ct. 562 (1988)*, 16 Fla. St. U.L. Rev. 159 (1988).

6

constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Id.* at 266 (citing 393 U.S. at 506). Justice White succinctly stated the Court's conclusion:

> Accordingly, we conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 272-73 (footnotes omitted).

What *Tinker*, *Pico*, and *Kuhlmeier* share is on the one hand the express recognition that school officials are to be afforded great deference in making educational decisions, but on the other hand, this deference does not extend to decisions based on reasons that offend students' First Amendment rights. It is instructive that Justice White writes for the *Kuhlmeier* majority in expressing this limitation. His insistence on the First Amendment rights of students can only confirm that his concurrence in *Pico* implicitly recognized that should the facts reveal a basis for removing the books involved that offended the First Amendment, the school's action would be unconstitutional.

### Sound Public Policy for Examining Reasons for Removing Books

The FLA, a local chapter of the American Library Association ("ALA"), has adopted as its own several statements of the ALA, including "Code of Ethics of the American Library Association" (Exhibit A); "Library Bill of Rights" (Exhibit B); and "The Freedom to Read Statement" (Exhibit C). In addition, the ALA's "Position Statement on the Role of the School Library Media Program" is attached hereto as Exhibit D. Each of these statements indicates the sound public policy which is embodied in the *Pico* decision.

For example, the code of ethics asserts that the ALA members "uphold the principles of intellectual freedom and resist efforts to censor library resources" and "distinguish between our personal convictions and professional duties." The ALA "Library Bill of Rights" provides that libraries "should challenge censorship" and "provide materials and information presenting all points of view." "The Freedom to Read Statement" notes:

> Such pressure toward conformity is perhaps natural to a time of accelerated change. And yet suppression is never more dangerous than in such a time of social tension. Freedom has given the United States the elasticity to endure strain. Freedom keeps open the path of novel and creative solutions, and enables change to come by choice. Every silencing of a heresy, every enforcement of an orthodoxy, diminishes the toughness and resilience of our society and leaves it the less able to deal with controversy and difference.

Finally, in the ALA's position statement on school libraries it asserts that "[t]he school library media center provides a setting where students develop skills they will need as adults to locate, analyze, evaluate, interpret, and communicate information and ideas in an information-rich world." Speaking to the very issue before the Court here, the statement notes: "Though one parent or member of the school community may feel a particular title in the school library media center's collection is inappropriate, others will feel the title is not only appropriate but desirable."

These position statements are broad and hortatory in nature, but they are also valuable expressions of the principles underlying the analyses the courts have made concerning the First Amendment right of students in the books contained in their school libraries. All courts, and certainly the FLA, recognize the right and responsibility of school officials to regulate and monitor those materials made available to students. There is, however, the equally strong corollary that the books that have been made available to students may not be taken from them by school officials based upon reasons which offend First Amendment rights. Were this not the case, the function of libraries would be greatly diminished, to the public ill, by changing moods

and philosophies, and of most concern, by changing political views of those who educate our children and manage our schools.

## The Board's Order is Unconstitutional.

In the final analysis, this is not a difficult case. It is well settled that pretext cannot be accepted as fact. In this case, the school district has in place a well developed collection acquisition policy and a well developed review procedure for complaints regarding the collections. The combined wisdom of that acquisition policy and of the committees who examined the complaint against ¡Vamos a Cuba!/ A Visit to Cuba was that the book was properly admitted to and retained in the library collections. The Board's basis for overruling this recommendation is blatantly based on the political "tenor" of the book, that is, that it does not emphasize that life in Cuba is hard and that the political system is oppressive. Clearly, an underlying concern of the Board is that some Cuban Americans are offended by this "lack" of political position.

Even the narrowest reading of *Pico* must conclude that removal of a library book from the school library because the school board or members of the community object to its content on grounds of political opinion or political sensitivity in the community at large is unconstitutional as a violation of students' First Amendment rights. Going further, the Board's failure to follow those procedures established for reviewing books for possible removal from the library, whatever the fate of ¡Vamos a Cuba!/ A Visit to Cuba, in removing all books in the Visit Book series must on its face represent an unconstitutional act, certainly under the First Amendment because the removal implicates those rights, and presumably under the Fourteenth Amendment because the Board's blatant disregard of due process with respect to other books in the series.

As the FLA has asserted above, the issue in this case is not whether *¡Vamos a Cuba!/ A Visit to Cuba* and other books in the "A Visit To" series are educationally suitable, that decision having been reached during the selection process and confirmed during the review process. Nor does it matter what political view is expressed, or not expressed, within the books, if any. There is no implication at all that any of the books contain obscene material or any other "disqualifying" unprotected speech. The Board's decision is based primarily, if not solely, on a desire to remove from the shelves a book whose political views (or lack thereof) it disapproves of, and to "disqualify by association" other books in the series in which it is contained.

### Conclusion

Because the Board's order is unconstitutional, the Visit Books must be retained in the school libraries.

Dated: July 6, 2006                                Respectfully submitted,

*/s/ Walter E. Forehand*
Walter E. Forehand (Fla. Bar No. 0793530)
wforehand@llw-law.com
Lewis, Longman & Walker, P.A.
125 South Gadsden Street
Tallahassee, FL 32312
Telephone: (850) 222-5702
Facsimile: (850) 224-1600
Attorney for Amicus Curiae,
  Florida Library Association

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by facsimile and U.S. Mail on all counsel or parties of record on the attached service list.

_____
Walter E. Forehand

## SERVICE LIST

### Case No. 06-21577 CIV-GOLD/Magistrate Judge Turnoff

Richard J. Ovelman
Jordan Burt, LLP
777 Brickell Avenue
Suite 500
Miami, FL 33131-2803
(305) 371-2600
(305) 372-9928 (facsimile)

Attorney for Defendants

Randall Marshall
Rosalind Matos
ACLU FOUNDATION OF FLORIDA, INC.
4500 Biscayne Boulevard, Suite 340
Miami, FL 33137-3227
Florida Bar No: 181765
(786) 363-2700
(786) 363-1108 (facsimile)

and

JoNel Newman
Florida Bar. No. 112320
University of Miami School of Law
1311 Miller Drive
Coral Gables, FL 33146
(305) 284-4125
(305) 284-1588 (facsimile)

Cooperating Attorney for the American Civil Liberties Union Foundation of Florida, Inc.

Attorneys for Plaintiff

### Code of Ethics of the American Library Association

As members of the American Library Association, we recognize the importance of codifying and making known to the profession and to the general public the ethical principles that guide the work of librarians, other professionals providing information services, library trustees and library staffs.

Ethical dilemmas occur when values are in conflict. The American Library Association Code of Ethics states the values to which we are committed, and embodies the ethical responsibilities of the profession in this changing information environment.

We significantly influence or control the selection, organization, preservation, and dissemination of information. In a political system grounded in an informed citizenry, we are members of a profession explicitly committed to intellectual freedom and the freedom of access to information. We have a special obligation to ensure the free flow of information and ideas to present and future generations.

The principles of this Code are expressed in broad statements to guide ethical decision making. These statements provide a framework; they cannot and do not dictate conduct to cover particular situations.

I. **We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.**
II. **We uphold the principles of intellectual freedom and resist all efforts to censor library resources.**
III. **We protect each library user's right to privacy and confidentiality with respect to information sought or received and resources consulted, borrowed, acquired or transmitted.**
IV. **We recognize and respect intellectual property rights.**
V. **We treat co-workers and other colleagues with respect, fairness and good faith, and advocate conditions of employment that safeguard the rights and welfare of all employees of our institutions.**
VI. **We do not advance private interests at the expense of library users, colleagues, or our employing institutions.**
VII. **We distinguish between our personal convictions and professional duties and do not allow our personal beliefs to interfere with fair representation of the aims of our institutions or the provision of access to their information resources.**
VIII. **We strive for excellence in the profession by maintaining and enhancing our own knowledge and skills, by encouraging the professional development of co-workers, and by fostering the aspirations of potential members of the profession.**

Adopted June 28, 1995, by the ALA Council



**Library Bill of Rights**

**The American Library Association affirms that all libraries are forums for information and ideas, and that the following basic policies should guide their services.**

I. Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

II. Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

III. Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

IV. Libraries should cooperate with all persons and groups concerned with resisting abridgment of free expression and free access to ideas.

V. A person's right to use a library should not be denied or abridged because of origin, age, background, or views.

VI. Libraries which make exhibit spaces and meeting rooms available to the public they serve should make such facilities available on an equitable basis, regardless of the beliefs or affiliations of individuals or groups requesting their use.

Adopted June 18, 1948, by the ALA Council; amended February 2, 1961; January 23, 1980; inclusion of "age" reaffirmed January 23, 1996.



**The Freedom to Read Statement**

The freedom to read is essential to our democracy. It is continuously under attack. Private groups and public authorities in various parts of the country are working to remove or limit access to reading materials, to censor content in schools, to label "controversial" views, to distribute lists of "objectionable" books or authors, and to purge libraries. These actions apparently rise from a view that our national tradition of free expression is no longer valid; that censorship and suppression are needed to counter threats to safety or national security, as well as to avoid the subversion of politics and the corruption of morals. We, as individuals devoted to reading and as librarians and publishers responsible for disseminating ideas, wish to assert the public interest in the preservation of the freedom to read.

Most attempts at suppression rest on a denial of the fundamental premise of democracy: that the ordinary individual, by exercising critical judgment, will select the good and reject the bad. We trust Americans to recognize propaganda and misinformation, and to make their own decisions about what they read and believe. We do not believe they are prepared to sacrifice their heritage of a free press in order to be "protected" against what others think may be bad for them. We believe they still favor free enterprise in ideas and expression.

These efforts at suppression are related to a larger pattern of pressures being brought against education, the press, art and images, films, broadcast media, and the Internet. The problem is not only one of actual censorship. The shadow of fear cast by these pressures leads, we suspect, to an even larger voluntary curtailment of expression by those who seek to avoid controversy or unwelcome scrutiny by government officials.

Such pressure toward conformity is perhaps natural to a time of accelerated change. And yet suppression is never more dangerous than in such a time of social tension. Freedom has given the United States the elasticity to endure strain. Freedom keeps open the path of novel and creative solutions, and enables change to come by choice. Every silencing of a heresy, every enforcement of an orthodoxy, diminishes the toughness and resilience of our society and leaves it the less able to deal with controversy and difference.

Now as always in our history, reading is among our greatest freedoms. The freedom to read and write is almost the only means for making generally available ideas or manners of expression that can initially command only a small audience. The written word is the natural medium for the new idea and the untried voice from which come the original contributions to social growth. It is essential to the extended discussion that serious thought requires, and to the accumulation of knowledge and ideas into organized collections.

We believe that free communication is essential to the preservation of a free society and a creative culture. We believe that these pressures toward conformity present the danger of limiting the range and variety of inquiry and expression on which our democracy and our culture depend. We believe that every American community must jealously guard the freedom to publish and to circulate, in order to preserve its own freedom to read. We believe that publishers and librarians have a profound responsibility to give validity to that freedom to read by making it possible for the readers to choose freely from a variety of offerings.

The freedom to read is guaranteed by the Constitution. Those with faith in free people will stand firm on these constitutional guarantees of essential rights and will exercise the responsibilities that accompany these rights.

We therefore affirm these propositions:

1. *It is in the public interest for publishers and librarians to make available the widest diversity of views and expressions, including those that are unorthodox, unpopular, or considered dangerous by the majority.*

    Creative thought is by definition new, and what is new is different. The bearer of every new thought is a rebel until that idea is refined and tested. Totalitarian systems attempt to maintain themselves in power by the ruthless suppression of any concept that challenges the established orthodoxy. The power of a democratic system to adapt to change is vastly strengthened by the freedom of its citizens to choose widely from among conflicting opinions offered freely to them. To stifle every nonconformist idea at birth would mark the end of the democratic process. Furthermore, only through the constant activity of weighing and selecting can the democratic mind attain the strength demanded by times like these. We need to know not only what we believe but why we believe it.

2. *Publishers, librarians, and booksellers do not need to endorse every idea or presentation they make*

EXHIBIT C

available. It would conflict with the public interest for them to establish their own political, moral, or aesthetic views as a standard for determining what should be published or circulated.

Publishers and librarians serve the educational process by helping to make available knowledge and ideas required for the growth of the mind and the increase of learning. They do not foster education by imposing as mentors the patterns of their own thought. The people should have the freedom to read and consider a broader range of ideas than those that may be held by any single librarian or publisher or government or church. It is wrong that what one can read should be confined to what another thinks proper.

3. *It is contrary to the public interest for publishers or librarians to bar access to writings on the basis of the personal history or political affiliations of the author.*

   No art or literature can flourish if it is to be measured by the political views or private lives of its creators. No society of free people can flourish that draws up lists of writers to whom it will not listen, whatever they may have to say.

4. *There is no place in our society for efforts to coerce the taste of others, to confine adults to the reading matter deemed suitable for adolescents, or to inhibit the efforts of writers to achieve artistic expression.*

   To some, much of modern expression is shocking. But is not much of life itself shocking? We cut off literature at the source if we prevent writers from dealing with the stuff of life. Parents and teachers have a responsibility to prepare the young to meet the diversity of experiences in life to which they will be exposed, as they have a responsibility to help them learn to think critically for themselves. These are affirmative responsibilities, not to be discharged simply by preventing them from reading works for which they are not yet prepared. In these matters values differ, and values cannot be legislated; nor can machinery be devised that will suit the demands of one group without limiting the freedom of others.

5. *It is not in the public interest to force a reader to accept the prejudgment of a label characterizing any expression or its author as subversive or dangerous.*

   The ideal of labeling presupposes the existence of individuals or groups with wisdom to determine by authority what is good or bad for others. It presupposes that individuals must be directed in making up their minds about the ideas they examine. But Americans do not need others to do their thinking for them.

6. *It is the responsibility of publishers and librarians, as guardians of the people's freedom to read, to contest encroachments upon that freedom by individuals or groups seeking to impose their own standards or tastes upon the community at large; and by the government whenever it seeks to reduce or deny public access to public information.*

   It is inevitable in the give and take of the democratic process that the political, the moral, or the aesthetic concepts of an individual or group will occasionally collide with those of another individual or group. In a free society individuals are free to determine for themselves what they wish to read, and each group is free to determine what it will recommend to its freely associated members. But no group has the right to take the law into its own hands, and to impose its own concept of politics or morality upon other members of a democratic society. Freedom is no freedom if it is accorded only to the accepted and the inoffensive. Further, democratic societies are more safe, free, and creative when the free flow of public information is not restricted by governmental prerogative or self-censorship.

7. *It is the responsibility of publishers and librarians to give full meaning to the freedom to read by providing books that enrich the quality and diversity of thought and expression. By the exercise of this affirmative responsibility, they can demonstrate that the answer to a "bad" book is a good one, the answer to a "bad" idea is a good one.*

   The freedom to read is of little consequence when the reader cannot obtain matter fit for that reader's purpose. What is needed is not only the absence of restraint, but the positive provision of opportunity for the people to read the best that has been thought and said. Books are the major channel by which the intellectual inheritance is handed down, and the principal means of its testing

and growth. The defense of the freedom to read requires of all publishers and librarians the utmost of their faculties, and deserves of all Americans the fullest of their support.

We state these propositions neither lightly nor as easy generalizations. We here stake out a lofty claim for the value of the written word. We do so because we believe that it is possessed of enormous variety and usefulness, worthy of cherishing and keeping free. We realize that the application of these propositions may mean the dissemination of ideas and manners of expression that are repugnant to many persons. We do not state these propositions in the comfortable belief that what people read is unimportant. We believe rather that what people read is deeply important; that ideas can be dangerous; but that the suppression of ideas is fatal to a democratic society. Freedom itself is a dangerous way of life, but it is ours.

This statement was originally issued in May of 1953 by the Westchester Conference of the American Library Association and the American Book Publishers Council, which in 1970 consolidated with the American Educational Publishers Institute to become the Association of American Publishers.

Adopted June 25, 1953, by the ALA Council and the AAP Freedom to Read Committee; amended January 28, 1972; January 16, 1991; July 12, 2000; June 30, 2004.

*A Joint Statement by:*

**American Library Association**
**Association of American Publishers**

*Subsequently endorsed by:*

**American Booksellers Foundation for Free Expression**
**The Association of American University Presses, Inc.**
**The Children's Book Council**
**Freedom to Read Foundation**
**National Association of College Stores**
**National Coalition Against Censorship**
**National Council of Teachers of English**
**The Thomas Jefferson Center for the Protection of Free Expression**

ALA American Library Association

## Position Statement on the Role of the School Library Media Program

The school library media program is not only integral to and supportive of the school curriculum, but also provides a mechanism for choice and exploration beyond the prescribed course of study. The school library media program provides a wide range of resources and information that satisfy the educational needs and interests of students. Materials are selected to meet the wide range of students individual learning styles. The school library media center is a place where students may explore more fully classroom subjects that interest them, expand their imagination, delve into areas of personal interest, and develop the ability to think clearly, critically, and creatively about the resources they have chosen to read, hear, or view.

The school library media center provides a setting where students develop skills they will need as adults to locate, analyze, evaluate, interpret, and communicate information and ideas in an information-rich world. Students are encouraged to realize their potential as informed citizens who think critically and solve problems, to observe rights and responsibilities relating to the generation and flow of information and ideas, and to appreciate the value of literature in an educated society.

The school library media program serves all of the students of the community--not only the children of the most powerful, the most vocal or even the majority, but all of the students who attend the school. The collection includes materials to meet the needs of all learners, including the gifted, as well as the reluctant readers, the mentally, physically, and emotionally impaired, and those from a diversity of backgrounds. The school library media program strives to maintain a diverse collection that represents various points of view on current and historical issues, as well as a wide variety of areas of interest to all students served. Though one parent or member of the school community may feel a particular title in the school library media center's collection is inappropriate, others will feel the title is not only appropriate but desirable.

The school library media center is the symbol to students of our most cherished freedom--the freedom to speak our minds and hear what others have to say. I urge that the decision of this board be one which reaffirms the importance and value of the freedom to read, view, and listen and sends a message to students that in America, they have the right to choose what they will read, view, or hear and are expected to develop the ability to think clearly, critically, and creatively about their choices; rather than allowing others to do this for them.

Adopted October, 1990

EXHIBIT D