UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-21577 CIV-GOLD/Turnoff

AMERICAN CIVIL LIBERTIES UNION
OF FLORIDA. INC., GREATER MIAMI
CHAPTER, MIAMI-DADE COUNTY
STUDENT GOVERNMENT
ASSOCIATION.

      Plaintiffs,

v.

MIAMI-DADE COUNTY SCHOOL
BOARD, RUDOLPH F. CREW, in his
official capacity as Superintendent of
Schools, Miami-Dade County Public
Schools.

      Defendants.

_____/



## DEFENDANTS' INITIAL MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Defendants, the Miami-Dade County School Board, and Rudolph F. Crew ("the School Board") submit this Initial Memorandum addressing only the Plaintiffs' (hereafter "the ACLU") likelihood of success on the merits of this action.  Pursuant to this Court's Orders on Supplemental Briefing, the School Board will respond to the ACLU's brief on the remaining three prongs of the preliminary injunction test by memorandum filed July 18, 2006.

### ARGUMENT

The facts relevant to this Memorandum of Law are set forth in the School Board's separately filed Response to the Plaintiffs' Statement of the Case and Facts, which was also a separately filed document.  Based upon the material facts, the School Board demonstrates below that the ACLU has failed to establish a likelihood of success on the merits for five fundamental

reasons:

1.    The Supreme Court's decision in *Pico* "has no precedential value as to the application of First Amendment principles to school's decision to remove books from the library" because a majority of justices agreed only that reversal of the summary judgment should be affirmed. *Chiras v. Miller*, 432 F.3d 606, 619 n.32 (5th Cir. 2005); *see Marks v. United States*, 430 U.S. 188, 192-93 (1977). To the degree the seven different opinions of the Justices in *Pico* provide guidance to this Court, they support the School Board's position. A numerical majority of Justices rejected the claim that students enjoy a constitutional right of access to information in school library books. And the dissent by the Chief Justice for four Justices, which recognizes the fundamental right of parents to control the books their very young children read in school through the democratically elected School Board, is better reasoned than Justice Brennan's plurality opinion for three Justices that would shift that authority to the federal judiciary.

2.    Since the books were removed because they are rife with material omissions of basic facts, and are so misleading as to present a false view of the countries as a matter of fact, their removal would be justified even under Justice Brennan's "educational suitability" test.

3.    Under the subsequently adopted *Hazelwood* test, removal would be proper if the school library selection process were regarded as "school sponsored speech" because the replacement of such inaccurate books is "reasonably related to a legitimate pedagogical concern."

4.    Under the contemporary First Amendment precedent of the United States Supreme Court and this Circuit, the selection and removal of elementary school library books, at least under the system adopted by the School Board here, as set forth in the Response to the

2

Statement of Facts. is clearly a curricular function in a nonpublic forum that constitutes "government speech," which implicates no First Amendment rights of the ACLU.

5.     The School Board committed no due process violation because there is no rule restricting it from acting on a system-wide basis when the issue of book removal is properly before it. and its review finds the works educationally unsuitable.

Ultimately. the ACLU's position is doubly flawed:  It confuses the well justified, and deeply felt offense parents in the School Board's community feel about a book for their children that is rife with inaccuracies, material omissions and misleading representations in its portrayal of life in Cuba with the legitimate basis for the Board's removal of the book; namely. its global inaccuracy.  The ACLU is also fundamentally mistaken in asserting that the removal of a book which lacks virtually all relevant factual information about Cuba and falsely "sanitizes" conditions there could somehow abridge the putative right of students to receive information, a "right" which. in any event, has been rejected by the United States Supreme Court.

**I.     THE ACLU HAS DEMONSTRATED NO LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE *PICO* HAS NO PRECEDENTIAL VALUE AND TO THE DEGREE THAT THE SEVEN DIFFERENT OPINIONS OF THE JUSTICES RETAIN ANY PRESCRIPTIVE VALUE THEY MILITATE IN FAVOR OF THE SCHOOL BOARD'S DECISION TO REMOVE THE BOOK**

The ACLU's principal argument is that in *Board of Education. Island Trees Union Free School District No. 26 v. Pico.* 457 U.S. 853 (1982), "the Supreme Court held that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics. nationalism. religion or other matters of opinion.  457 U.S. at 872 (plurality opinion)." Supp. Mem. at 4.  But the Supreme Court held no such thing.  As the Fifth Circuit Court of Appeals recently and trenchantly observed:

As this court noted in *Muir v. Alabama Educ. Television Comm'n*, the opinions of the Justices in *Pico* are highly fractured. *See* 688 F.2d 1033, 1045 n. 30 (5th Cir. 1982). A majority of the Justices did not join any single opinion. The plurality opinion was joined by Justices Marshall and Stevens. Justice Blackmun concurred in part, but dissented from the plurality's conclusion that the "right to receive information" imposes a duty upon the state to provide information or ideas. See *Pico*, 457 U.S. at 878-79, 102 S.Ct. 2799 (Blackmun, J., concurring in part). Chief Justice Burger and Justices Powell, Rehnquist, and O'Connor all dissent, agreeing with Justice Blackmun that there is no duty imposed on the state to provide continuing access to particular books. *Id.* at 888-89, 102 S.Ct. 2799 (Burger, C.J., dissenting). Justice White concurred in the judgment of the Court on the narrowest grounds, concluding that the factual support for summary judgment was lacking, and that the case should be remanded for further factual development. *Id.* at 883-84, 102 S.Ct. 2799 (White, J., concurring). As a result, this court concluded in *Muir* that *Pico* has no precedential value as to the application of First Amendment principles to the school's decision to remove the books from the library. *Muir*, 688 F.2d at 1045 n. 30 (citing *Marks v. United States*, 430 U.S. 188, 192-93, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Indeed, Chief Justice Burger noted in his dissent that the Court's decision contained no binding holding. *Pico*, 457 U.S. at 886 n. 2, 102 S.Ct. 2799 (Burger, C.J., dissenting).

*Chiras v. Miller*, 432 F.3d 606, 619 n.32. (5th Cir. 2005); *Removing Books From School Libraries*, 96 Harv. L. Rev. 151, 152 n.11 (1982). Thus the claim, also made in the ACLU's brief, that the Supreme Court decided the issues presented in this case in *Pico* is simply mistaken as a matter of basic constitutional law.[1]

---

[1] The ACLU cites ten cases which may be regarded as either precursors or progeny of the *Pico* plurality opinion by Justice Brennan. Not one of the lower court cases cited by the ACLU is persuasive authority. In *Minarcini v. Strongsville City School District*, 541 F.2d 577 (6th Cir. 1976), the Court held that the removal of certain books from the school library violated the students right to receive information, based on Justice Blackmun's opinion in *Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council Inc.*, 425 U.S. 748 (1976), but in *Pico* itself, decided 6 years later, a numerical majority of Justices, including Justice Blackmun, rejected any such right in the context of a School Board's removal of library books.

Similarly, *Right to Read Defense Committee of Chelsea v. School Committee of Chelsea*, 454 F. Supp. 703 (D. Mass. 1978), is clearly no longer good law. The case holds that a very vulgar and sexually explicit poem could not be removed from the high school library because it was not legally "obscene." But even Justice Brennan's plurality opinion in Pico rejects this position, acknowledging the School Board may remove books it finds to be "vulgar." 457 U.S.

(Continued)

4

(Continued)

at 871; and it is precluded now by *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986) and the law of this Circuit established by the *Virgil* decision discussed below.

The decision in *Sund v. City of Wichita Falls, Texas*, 121 F. Supp. 2d 530 (N.D. Tex. 2000) involves the ability of adults to censor the holdings of a public library, not a school library, with regard to children's books. It is predicated upon a "limited public forum" and right to receive information analysis rejected by the Supreme Court in the *ALA* decision discussed below, and by a majority in *Pico*.

The decision in *Gay Guardian Newspaper v. Ohoopee Regional Library System*, 235 F. Supp. 2d 1362 (S.D. Ga. 2002) provides no support to the ACLU because the Court *rejected* a First Amendment access claim to place gay publications on a free literature table in a *public library lobby*.

The decision in *Sheck v. Baileyville School Committee*, 530 F. Supp. 679 (D. Maine 1982) is also bad law because it is based both on the student's right to receive information in the banned book that was rejected in the majority of *Pico* opinions and holds, contrary even to the *Pico* plurality, *Bethel*, and this Circuit, that extremely vulgar and sexual language is not sufficient to ban a book.

The opinion in *Silano v. Sag Harbor Union Free School District*, 42 F.3d 719 (2d Cir. 1994) provides no support to the ACLU because the court *rejects* the First Amendment claim of a guest lecturer at a 10th grade class who protested his censure for showing *film clips of bare chested women. In dicta*, the Court distinguished curricular activities from school library activity on the ground that the *Pico* plurality considered the latter optional and therefore less subject to school authority. The facts in this case show that elementary school library use is not "optional" for Miami-Dade County children, and in any event, the four justices dissenting in *Pico* rejected this distinction:

> The plurality distinguishes library books from textbooks because library books "by their nature are optional rather than required reading." *Ante*, at 2805. It is not clear, however, why this distinction requires *greater* scrutiny before "optional" reading materials may be removed. It would appear that required reading and textbooks have a greater likelihood of imposing a " 'pall of orthodoxy' " over the educational process than do optional reading. *Ante*, at 2809. In essence, the plurality's view transforms the availability of this "optional" reading into a "right" to have this "optional" reading maintained at the demand of teenagers.

457 U.S. at 892.

In *Salvail v. Nashua Board of Education*, 469 F. Supp. 1269 (D. N. H. 1979), the Court concluded that there was no "substantial and legitimate government purpose" served by excluding MS Magazine from the school library because it was not legally obscene, although it contained vulgar and overtly sexual content. It is doubtful that this decision would pass muster either under *Bethel* or Justice Brennan's *Pico* analysis, but certainly no one contended the magazine was academically unsuitable due to material factual omissions and misleading factual characterizations, as is the case here.

The ACLU cites *Pratt v. Independent School District No. 31*, 670 F.2d 771(8th Cir. 1982) even though it involves neither a book nor a school library, but rather the removal of a

(Continued)

5

In *Pico*, the School Board removed nine books from the high school libraries and junior high school libraries, including *Slaughterhouse Five*, *The Naked Ape*, and *Soul On Ice*. Several students sued the Board on the ground that removal of the books violated their First Amendment rights. The district court granted summary judgment for the School Board, but the Second Circuit reversed on grounds that there were material issues of fact.

Justice Brennan, writing only for himself and Justices Stevens and Marshall voted to affirm the reversal of the summary judgment. He advanced two grounds for this position. First, he claimed that students in public schools have an enforceable First Amendment right to receive information in the form of school library books. 457 U.S. at 863-869. This First Amendment right of access was said to operate as a limit on the School Board's discretion to select and remove school library books. Second, Justice Brennan asserted "that local school boards may

---

(Continued)

film version of "The Lottery" from the school curriculum. The standard applied, "substantial and legitimate government interest" is contrary to the more deferential test adopted by this Circuit in the *Virgil* decision discussed below ("reasonably related to a legitimate pedagogical interest") and has in any event been replaced altogether by the "government speech" doctrine explicated *infra*.

The opinion in *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) did not involve the removal of books from the school library, but rather whether the requirement of parental permission slips to check out the Harry Potter books, because they allegedly promote disobedience and involve "witchcraft" and the "occult," violated the First Amendment rights of students as guaranteed by *Tinker* and the plurality opinion in *Pico*. The Court held it did, concluding a "stigma" was created by having to check out the book. The Court was oblivious to the fact that *Tinker* has long been considered to apply only to the expressive rights of children that happen to be exercised at school, but which are otherwise unrelated to it, or the prior rejection of the right to receive information in *Pico*.

Finally, *Campbell v. St. Tammany Parish School Board*, 63 F.3d 184 (5th Cir. 1995) has been superseded in its analysis of *Pico* by the Fifth Circuit's *Chiras* case quoted above at page 3. The *Campbell* case also was decided before the development of the "government speech" doctrine, and it fails to analyze *Hazelwood*. It is distinguishable on its facts because school library selection and use in *Campbell* were not found to be "curricular," as they are for elementary school libraries in Miami-Dade County. Moreover, the *Campbell* Court actually applied the *Pico* plurality's motive test to reverse a summary judgment *against the School Board*.

not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" 457 U.S. at 872. Justice Brennan, however, acknowledged there were two exceptions to his motive or intent-based theory: if the School Board acted either because the books were "pervasively vulgar" or their removal was predicated on the lack of "educational suitability" of the books, there would be no First Amendment violation. 457 U.S. at 871.

Justice Blackmun expressly declined to join in the portion of the Brennan plurality that recognized a putative First Amendment right of students to receive information. 457 U.S. at 878-879. Instead, he concurred only on the narrow ground that he believed "the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." 457 U.S. at 879. Justice Blackmun concluded "my view presents the obverse of the plurality's analysis: while the plurality focuses on the failure to provide information, I find crucial the State's decision to single out an idea for disapproval and then deny access to it." *Id.* at 879 n.2.

Justice Blackmun found the *Pico* case very difficult because, for him, it presented two fundamentally opposed rights:

> To my mind, this case presents a particularly complex problem because it involves two competing principles of constitutional stature. On the one hand, as the dissenting opinions demonstrate, and as we all can agree, the Court has acknowledged the importance of the public schools "in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests." *Ambach v. Norwick*, 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979). See, also, *ante*, at 2806-2807 (plurality opinion). *Because of the essential socializing function of schools, local education officials may attempt "to promote civic virtues,"* Ambach v. Norwick, 441 U.S., at 80, 99 S.Ct., at 1596, and to "awake[n] the child to cultural values." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

> *Indeed, the Constitution presupposes the existence of an informed citizenry prepared to participate in governmental affairs, and these democratic principles obviously are constitutionally incorporated into the structure of our government. It therefore seems entirely appropriate that the State use "public schools [to] ··· inculcat[e] fundamental values necessary to the maintenance of a democratic political system." Ambach v. Norwick,* 441 U.S., at 77, 99 S.Ct., at 1594.

> On the other hand, as the plurality demonstrates, it is beyond dispute that schools and school boards must operate within the confines of the First Amendment. In a variety of academic settings the Court therefore has acknowledged the force of the principle that schools, like other enterprises operated by the State, may not be run in such a manner as to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

*Id.* at 876 (emphasis added).  *See* also Brennan at 457 U.S. at 863-64 recognizing similar "competing rights."

Justice White, as noted above, provided the fifth vote for affirming the reversal of the summary judgment, but he made it crystal clear that he regarded any consideration of any constitutional issues premature at best and at worst improper: writing that "[W]e should not decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here." *Id.* at 884.

Chief Justice Burger, writing also for Justice Powell, Justice Rehnquist, and Justice O'Connor vehemently dissented, rejecting the new right proposed by the plurality opinion:

> In an attempt to deal with a problem in an area traditionally left to the states, *a plurality of the Court, in a lavish expansion going beyond any prior holding under the First Amendment, expresses its view that a school board's decision concerning what books are to be in the school library is subject to federal-court review. Were this to become the law, this Court would come perilously close to becoming a "super censor" of school board library decisions. Stripped to its essentials, the issue comes down to two important propositions: first, whether local schools are to be administered by elected school boards, or by federal judges and teenage pupils;* and *second,* whether the values of morality, good taste, and relevance to education are valid reasons for school board decisions concerning the contents of a school library. In an attempt to place this case within the protection of the First Amendment, the plurality suggests a new

8

> "right" that, when shorn of the plurality's rhetoric, allows this Court to
> impose its own views about what books must be made available to
> students.

*Id.* at 886 (emphasis added).

The four dissenters also remind us that it is the people who select the School Board in a

democratic election, which after all is also protected activity under the freedom of association

rights guaranteed by First Amendment and its central purpose:

> We can all agree that as a matter of *educational policy* students should
> have wide access to information and ideas. *But the people elect school
> boards, who in turn select administrators, who select the teachers, and
> these are the individuals best able to determine the substance of that
> policy. The plurality fails to recognize the fact that local control of
> education involves democracy in a microcosm. In most public schools in
> the United States the parents have a large voice in running the school.
> Through participation in the election of school board members, the
> parents influence, if not control, the direction of their children's
> education. A school board is not a giant bureaucracy far removed from
> accountability for its actions; it is truly "of the people and by the people."*
> A school board reflects its constituency in a very real sense and thus could
> not long exercise unchecked discretion in its choice to acquire or remove
> books. If the parents disagree with the educational decisions of the school
> board, they can take steps to remove the board members from office.
> Finally, even if parents and students cannot convince the school board
> that book removal is inappropriate, they have alternative sources to the
> same end. Books may be acquired from bookstores, public libraries, or
> other alternative sources unconnected with the unique environment of the
> local public schools.

*Id.* at 891-92 (emphasis added).

Thus, more carefully read, a majority of Justices in *Pico* rejected any right of school

children to receive information through the school library (Blackmun, and the dissenters), and

the members of the Court deadlocked over whether there is any First Amendment right to review

removal of school books by a School Board even on the ground that the motive of the Board was

its disagreement with the ideas in the book. However, the plurality acknowledged that a book

may be removed if the Board does not like it because it is "educationally unsuitable." That, of

9

course, is the reason the School Board removed the geography books here. This series of books omits so many material facts about the countries it addresses, sanitizes and homogenizes the social life in them, and is so misleading, that it gives an entirely false impression of these countries. The ACLU ironically objects to the removal of a book which deprives children of the most salient facts about Cuba on the ground that they are not prepared for the truth or the facts. This sort of paternalistic restriction is scarcely consistent with the broad First Amendment "right to receive information" the ACLU pretends to assert. Moreover, it highlights the fact that the issue here is educational suitability: which facts about Cuba and other countries should be in books for four to seven years olds. Surely, this is a question for the School Board that the parents elected by their exercise of their First Amendment right to freedom of association, and not by the federal judiciary. [2]

## II.   BECAUSE THE SELECTION AND REMOVAL OF BOOKS IN THE SCHOOL LIBRARY CONSTITUTES "GOVERNMENT SPEECH," THE ACLU HAS PRESENTED NO COGNIZABLE FIRST AMENDMENT CLAIM

The *Pico* case, whatever its lingering significance, has been replaced by a new matrix of constitutional analysis that is based on the subsequent Supreme Court decisions recognizing "school sponsored speech" in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) and the "government speech doctrine," which is an outgrowth of the dissent in *Pico*. *United States v. Am. Library Ass'n*, 539 U.S. 194 (2003) ("*ALA*"); *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569 (1998); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998); *Rosenberger v.*

---

[2] As will be recounted *infra*, the "educational suitability" standard in the Brennan plurality opinion, and the competing rights framework in the Blackmun concurrence, have passed from the scene in subsequent Supreme Court opinions because they are not workable standards for the Court. Educational suitability is an issue for educators, not judges, and a framework pitting fundamental rights against each other provides no principled basis for resolving cases or controversies regarding them. *Removing Books*, 96 Harv. L. Rev. at 156-157, 160.

*Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Rust v. Sullivan*, 500 U.S. 173 (1991). *See Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208 (11th Cir. 2004).

In *Hazelwood*, a high school principal removed two pages from the school newspaper which contained descriptions of student experiences with teen pregnancy and parental divorce. The Supreme Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. If *Hazelwood* applied to this case, because the school library could be regarded as "school-sponsored expression", the School Board's removal of the books would be constitutional because it is reasonably related to the valid pedagogical concern of having children's geography books that do not misleadingly "sanitize" and falsely portray other countries. Indeed, *Hazelwood* has been applied analogously by this Circuit in *Virgil v. School Board of Columbia County Florida*, 862 F.2d 1517 (11th Cir. 1989). The School Board removed a textbook containing the classics *Lysistrata* by Aristophanes and *The Miller's Tale* by Chaucer from the curriculum, even though those pieces were neither required nor assigned readings. *Id.* at 1519. The removal was challenged, and the Eleventh Circuit applied the *Hazelwood* test to permit the removal. While stating that the Court did not agree with the School Board's decision, the Eleventh Circuit held that even though the readings were at most "optional" and not required, they were "curricular" in nature. *Id.* at 1522. The Board's belief that the works were not "educationally suitable" because they are offensively vulgar and overtly sexual was held to be a legitimate pedagogical interest. Under *Virgil*, the School Board's decision to remove geography books here, because of their glaringly offensive omissions and inaccurate characterizations, clearly is reasonably related to a valid pedagogical interest.

11

The School Board doubts that even the deferential *Virgil* and *Hazelwood* test applies to the selection and removal of books from the Miami-Dade elementary school libraries. Instead, the taxonomy of school expression, adopted in *Bannon v. School District of Palm Beach County*, 387 F.3d 1208 (11th Cir. 2004), and more particularly the doctrine of "government speech," govern this case. The Eleventh Circuit has explained:

> Within scholastic nonpublic fora,[3] there are four clear categories of expression: vulgar expression, pure student expression, government expression, and school-sponsored expression.
>
> Vulgar expression is student expression that is lewd, offensive, or indecent, and schools may freely curtail it. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Pure student expression is student expression that merely happens to occur on the school premises, and schools must tolerate such expression unless they can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. *Government expression is expression delivered directly through the government or indirectly through private intermediaries, and the government is free to make subject-matter-based choices. See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Finally, between the spectrum of pure student expression and government expression *is the intermediate category of school-sponsored expression: when "students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school,"* schools may censor student expression so long as their actions are reasonably related to legitimate pedagogical concerns. *Hazelwood*, 484 U.S. at 271-73, 108 S.Ct. 562.

*Id.* at 1213-14 (emphasis added).

Obviously, the selection of school library books, and their removal by school authorities, by applying the same standards as for textbooks, constitutes "government speech." No "student expressive activity" is involved at all. Neither parents, nor authors, nor students, have any right

---

[3] Miami-Dade County's selection and removal of books in elementary school libraries clearly constitutes a nonpublic forum because the process is not "open" to public participation. *Bannon*, 387 F.3d at 1212-1213.

to place or remove books from the school library. Only school authorities. and ultimately the Board may do so. The school's exercise of its authority to choose the books it wishes to perform its duties of education and inculcate community and democratic values constitutes government speech under the relevant case law.

Whether the selection and removal of school books from Miami-Dade schools involves "government speech" or "school-sponsored speech" is important because the former implicates no First Amendment rights. while the latter is subject to some First Amendment restriction, although under a deferential standard of review. In particular, the case law is deeply divided as to whether *Hazelwood* requires "view point neutral" restrictions, while admittedly permitting content-based distinctions, and the distinction between the former and latter restraints is unclear. *See. Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918, 926-928 (10th Cir. 2002).

In *Rosenberger.* the Court explained the basic principle of "government speech":

> The quoted language in *Widmar* was but a proper recognition of the principle that when the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides. it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. In the same vein, in *Rust v. Sullivan. supra.* we upheld the government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling. There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. 500 U.S., at 194, 111 S.Ct., at 1773. When the government disburses public funds to private entities to convey a governmental message. it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.

515 U.S. at 833.

Perhaps even more to the point, as the Fifth Circuit explained in *Chiras v. Miller.* 432 F.3d 606 (5th Cir. 2005). the Supreme Court in *ALA* has denominated the selection of books in

public libraries as "government speech," and that should apply equally to school libraries:

> Third, and most recently, the Court concluded that forum analysis was inappropriate in *United States v. Am. Library Ass'n, Inc.,* 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003). In *ALA,* the Court addressed claims that the Children's Internet Protection Act, which required public libraries to use internet filters as a condition for receipt of federal subsidies, violated the First Amendment. In that case, the Court found that "[j]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Id.* at 205, 123 S.Ct. 2297. "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Id.; see also* Mark G. Yudof, *Personal Speech and Government Expression,* 38 CASE W. RES. L.REV., 671, 687 (1987) (*"Even in the school library, the librarian must normally implement the board's decisions, and certainly the writers of the books do not have a constitutional right to determine what books will be acquired."*). (emphasis added)

*Id.* at 614. The court in *People For The Ethical Treatment of Animals v. Gittens,* 414 F.3d 23, 29

(D.C. Cir. 2005) elaborated on the meaning of *ALA:*

> The issue in *American Library Ass'n* was whether Congress could condition funding to libraries on their implementation of internet filter software. Writing for a plurality, *Chief Justice Rehnquist stated that "forum analysis and heightened judicial scrutiny are incompatible" with the government's role as patron of the arts, television broadcaster, and librarian. Id.* at 204-05, 123 S.Ct. 2297. *Arkansas Educational Television Commission v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875, and *National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500, had suggested as much. As a television broadcaster, the government must "exercise ⋯ journalistic discretion." *Forbes,* 523 U.S. at 674, 118 S.Ct. 1633; as an arts patron, the government must "make esthetic judgments." *Finley,* 524 U.S. at 586, 118 S.Ct. 2168; *and as a librarian, the government must "have broad discretion to decide what material to provide to [its] patrons."* (emphasis added)

When "government speech" is involved, "The First Amendment's Free Speech Clause does not

limit the government as speaker, *Rosenberger,* 515 U.S. at 833." *Gittens,* 414 F.3d at 28.   As the

Court elaborated:

> To illustrate further, the authorities in charge of a city park must make content-neutral and viewpoint-neutral decisions when passing on

14

> applications for demonstrations in the park. *See. e.g.. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). But those First Amendment constraints do not apply when the same authorities engage in government speech by installing sculptures in the park.

414 F.3d at 29.

In *Chiras*, the Court held that the state's selection and use of textbooks constitutes "government speech," and the refusal of state officials to adopt an environmental text book did not violate any right of access of the text book author or any right to receive information of a student.[4] While in *Edwards v. California University of Pennsylvania*, 156 F.3d 488, 491-92 (3d Cir. 1998). the Court held that a public university's control over a professor's classroom activities because it was "government speech" that therefore implicated no First Amendment right.

The Court in *Chiras* identified four factors which courts have used in identifying governmental speech:

> In doing so, the district court relied on a four-factor test adopted by the Tenth Circuit to determine whether speech is that of the government or of a private speaker: (1) whether the "central purpose" of the project is to promote the views of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4) whether "ultimate responsibility" for the project rested with the government.

432 U.S. at 617. Applying these four factors here, it is clear that the School Board selection of elementary school library books is "government speech." The purpose of the school library collection is to promote the School Board's curricular and inculcative functions. not the private interests of the authors of the books selected to fulfill those functions. The school authorities

---

[4] Similarly, in *Downs v. Los Angeles Unified School District*. 228 F.3d 1003. 1009 (9th Cir. 2000), the court held that a school bulletin board is government speech and therefore a teacher had no right to post materials presenting a differing view point from the school's chosen message. In both *Chiras* and *Downs*, the courts distinguished Brennan's *Pico* plurality opinion on the ground that he considered the school library use there "non-curricular." The elementary school library use here. however, is clearly "curricular."

exercised strict editorial control through their rigorous application of their elaborate selection criteria. While the government was not the literal speaker, it need not be so under the case law where it is appropriate, as here, that it speaks through private authors. *Rosenberger, supra.* Finally, the ultimate responsibility for inclusion, removal, and the entire collection of books rests with the School Board. Consequently, the removal of the books here constitutes government speech that does not violate the First Amendment.

### III.   PURSUANT TO ITS OWN RULES AND REGULATIONS, THE SCHOOL BOARD HAD THE DISCRETION TO ORDER THE REMOVAL OF THE *CUBA BOOKS* FROM *ALL* DISTRICT SCHOOLS *AND* THE REMOVAL OF THE *ENTIRE SERIES* FROM *ALL* DISTRICT SCHOOLS.

Plaintiffs contend they are likely to succeed on their Due Process claims because the School Board allegedly "deviated from its own procedures in banning the Cuba books from *all* libraries in the School District. . . and. . . in banning all the books in the series." *See Memorandum of Law in Support of Plaintiffs' Emergency Motion for a Temporary Restraining Order,* p. 6. In support of this contention, Plaintiffs cite several cases holding that administrative agencies are required to follow their own rules and regulations. *See Morton v. Ruiz,* 415 U.S. 199, 235 (1974) ("[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Salvail v. Nashua Bd. of Educ.,* 469 F. Supp. 1269, 1273 (D.N.H. 1979) (holding that School Board was required to follow its own guidelines); *Sheck v. Baileyville Sch. Comm.,* 530 F. Supp. 679, 690 (D. Me. 1982) ("[t]he fourteenth amendment has been held to mandate that governmental units adhere to their own rules and regulations."). While plaintiffs are correct in claiming that administrative agencies are required to follow their own rules and regulations, plaintiffs' contention that the School Board "deviated" from its own procedures is incorrect because Plaintiffs do not, and cannot, point to any School Board Rule prohibiting it from ordering a district-wide removal of a book *or* ordering a district-wide removal of an entire

series of books. Even assuming that the School Board Rules somehow prohibit the School Board from taking such action, the Supreme Court acknowledged that "[i]t is always within the discretion of . . . an administrative agency to relax or modify its procedural rules. . . when in a given case the ends of justice require it." *See Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970).

The only Rule Plaintiffs point to in their Complaint and in their Motion for a Preliminary Injunction is Rule 6Gx13-6A-1.26. Section VIII of this Rule is entitled "Procedures for Consideration of Protests Concerning Instructional Materials and Educational Media." *See* Rule 6Gx13-6A-1.26, Section VIII. This section provides the "formal due process procedures" to be followed by the School Materials Review Committee (SMRC) and the District Materials Review Committee (DMRC) when reviewing a formal complaint regarding instructional materials.[5] *Id.* The DMRC is required to make a recommendation to the Superintendent within fifteen school work days of receipt of the complaint and the Superintendent is required to render a final decision within five school work days of receipt of the DMRC recommendation. *See* Rule 6Gx13-6A-1.26, Section VIII.C.3.d. & Section VIII.C.3.f. The Superintendent's decision may then be appealed to the School Board pursuant to Section VIII.C.3.h., which states: "[t]he complainant may appeal the decision of the Superintendent to the School Board in writing and may request an appearance before the Board in accordance with School Board Rule 6Gx13-8C-1.17."

Although Section VIII of Rule 6Gx13-6A-1.26 provides guidelines to be followed by the SMRC and the DMRC when reviewing formal complaints, the Rule is silent as to the procedures

---

[5] A formal complaint is initially reviewed by the SMRC. If the complainant is not satisfied with the decision of the SMRC, he/she may appeal the decision to the DMRC.

to be followed by the School Board. Thus, there is no School Board Rule prohibiting it from ordering a district-wide removal of a book or a series of books.

In a memorandum dated June 7, 2006, the School Board's attorney, JulieAnn Rico, stated: "we would urge the Board [to] follow the same guidelines as the DMRC when deciding an appeal of the Superintendent's decision on the status of the challenged materials." *See* Pls.' Ex. 12 at 4. Ms. Rico indicated that, in a previous opinion on this issue, she had suggested that the DMRC should "apply the same framework as mandated in the Rule for the school materials review committee" and should "adhere to the parameters prescribed by Section VIII.B.2.e. of the Rule when rendering its recommendation." *Id.* Section VIII.B.2.e. states:

> The committee's final recommendation may be any or a combination of the following: (1) allow the challenged material to maintain its current status; (2) leave the challenged material in the classroom or library media center, but allow students to use alternate materials approved by school personnel who require the use of the disputed item; (3) limit the educational use of the challenged material; (4) remove the challenged material from the total school environment.

Rule 6Gx13-6A-1.26, Section VIII.B.2.e.

Even assuming the DMRC guidelines govern the School Board, Section VIII.B.2.e. allows for the removal of the "challenged material" from "the total school environment." Rule 6Gx13-6A-1.26 does not provide a definition for the term "challenged material." At the very least, however, "challenged material" must include the Cuba book referred to in Mr. Amador's formal complaint. This term may also include the entire series of books because the Cuba book is representative of the entire series in that each book suffers from the same flaw – failure to satisfy the criteria listed in Section IV.A.1-15 & Section IV. B 1-5 of Rule 6Gx13-6A-1.26. Because the entire series was subject to the same editorial standards as the Cuba book, it was well within the School Board's discretion to remove the entire series from its school libraries

after determining that the Cuba book was educationally unsuitable.[6]

Rule 6Gx13-6A-1.26 does not restrict the term "total school environment." The ordinary meaning of the term "total" is broad enough to include every school in the district, establishing that the School Board had the authority to order a district-wide removal of the Cuba book *and the entire series*.[7]   Separately, there is also a sound policy argument that Rule 6Gx13-6A-1.26 should allow for district-wide action.  Because the School Board represents the interests of *all* of the schools in the district, it would be illogical for the Rules to only allow the Board to remove the Cuba book from *one* school after determining that the book was educationally unsuitable. The School Board would be expected to undertake the same analysis of the Cuba book (and reach the same conclusion) each time a parent from a different school filed a complaint. Therefore, allowing the School Board to order a *district-wide* removal of the Cuba book and the entire series would promote procedural efficiency when removal is based on the books inaccuracy.

In sum, Plaintiffs cannot point to any specific procedural guidelines that construe *School Board's authority* when reviewing a formal complaint regarding a library book.  Also, plaintiffs cannot point to any Rule specifically prohibiting the School Board from taking district-wide action *or* from removing an entire series of books if it finds that the whole series is flawed. Assuming that, as Ms. Rico advises, the School Board is required to follow the same guidelines

---

[6] Plaintiffs allege that there was no review of the other books in the series.  This contention is wrong.  In fact, during the May 22, 2006 DMRC meeting, the committee was "directed . . . to break into groups of three, select two other books from the "Visit to" series, and . . . read them." (Pl's Ex. 7 at p. 4).  Members were also directed to engage in "an open discussion on structural view in association with the series."  *Id.*  The committee also addressed the other books in the series at the second DMRC Meeting on June 5, 2006.  (Pl's Ex. 36).

[7] In her June 7, 2006 memorandum, School Board attorney Rico stated that Rule 6Gx13-6A-1.26 does *not* prohibit the Board from making a decision affecting the District as a whole.

as the DMRC, the School Board abided by its own rules and procedures when it ordered the district-wide removal of the Cuba book *as well as* the district-wide removal of the entire series.[8] For this reason, Plaintiffs are not likely to succeed in their Due Process claims.

## CONCLUSION

For the foregoing reasons, this Court should rule the ACLU has failed to demonstrate a likelihood of success on the merits.

Respectfully submitted by:

JulieAnn Rico
Florida Bar No. 316911
E-mail:  jrico@dadeschools.net
SCHOOL BOARD ATTORNEY'S OFFICE
MIAMI-DADE COUNTY SCHOOL BOARD
1450 N.E. 2nd Avenue, Suite 400
Miami, Florida 33132
Telephone:  (305) 995-1304
Facsimile:  (305) 995-1412

***Counsel for The School Board of Miami-Dade County, Florida***

Richard J. Ovelmen
Florida Bar No. 284904
E-mail:  rjo@jordenusa.com
Enrique D. Arana
Florida Bar No. 0189316
E-mail:  eda@jordenusa.com
JORDEN BURT LLP
777 Brickell Avenue, Suite 500
Miami, Florida 33131
Telephone:  (305) 371-2600
Facsimile:  (305) 372-9928

***Co-Counsel for The School Board of Miami-Dade County, Florida***

---

[8] It is also important to note that the School Board respected the complaining parent's Due Process rights by allowing the review process to run its course and refraining from issuing any orders until the complainant appealed his decision to the School Board. On April 18, 2006 (almost two months before the issue was ultimately appealed to the School Board), School Board member Frank Bolanos introduced Item B-19 for action at the Board meeting. Item B-19 was entitled "Protecting Our Children from the Hurtful & Insulting Distortions of the Book 'Vamos a Cuba' by Removing These Books from All of Our Public School Libraries." The School Board voted 6-3 against the Item.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was

furnished by hand delivery or facsimile/U.S. Mail this ___14th__ day of July, 2006 to:

JoNel Newman, Esq.                          (*VIA HAND DELIVERY*)
University of Miami School of Law
1311 Miller Drive
Coral Gables, Florida 33146
Telephone: (305) 284-4125
Facsimile:  (305) 284-1588
E-mail: jnewman@law.miami.edu

Randall C. Marshall, Esq.                   (*VIA HAND DELIVERY*)
Rosalind J. Matos, Esq.
ACLU Foundation of Florida, Inc.
4500 Biscayne Boulevard
Suite 340
Miami, Florida 33137-3227
Telephone:  (786) 363-2700
Facsimile:   (786) 363-1108
E-mail: rmarshall@aclufl.org
E-mail: rmatos@aclufl.org

Walter E. Forehand, Esq.                    (*VIA FACSIMILE AND U.S. MAIL*)
Lewis, Longman & Walker, P.A.
125 South Gadsden Street
Tallahassee, Florida 32312
Telephone: (850) 222-5702
Facsimile:  (850) 224-1600
E-mail: wforehand@llw-law.com

Richard J. Ovelmen

150707

21